[Cite as *State v. Caynon*, 2013-Ohio-2789.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 26559 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| HARRIET R. CAYNON | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 10 11 3277 (A) |

DECISION AND JOURNAL ENTRY

Dated: June 28, 2013

MOORE, Presiding Judge.

**{¶1}** Defendant-Appellant, Harriet Caynon appeals from her sentence and conviction set forth in the July 3, 2012 judgment entry of the Summit County Court of Common Pleas. We affirm.

I.

**{¶2}** This matter stems from a drug transaction involving an informant working with the Akron Police Department. Over the course of two weeks, the informant cooperated with the police in attempting to arrange for his uncle, Gerald Howard, to meet him at a local restaurant parking lot on Montrose Avenue in order to purchase approximately 200 grams of heroin. The informant told police that there was a "strong likelihood" that the heroin would be delivered in a tan four-door Volkswagen CC luxury sedan registered in Mr. Howard's name. The informant also told police that on one or two prior occasions when he purchased heroin from his uncle, a "black female with long black hair and glasses" actually provided the drugs. The transaction was

set to occur around the lunchtime hour on November 18, 2010. Prior to the transaction, Mr. Howard indicated that, on the date in question, he had to be in Cleveland to pay real estate taxes.

{¶3} On the day of the transaction, undercover surveillance was established in the restaurant parking lot on all four sides of the building. A detective stationed at the intersection of Montrose Avenue and State Route 18, in what appeared to be a broken down car with its hood up, first observed the tan Volkswagen registered to Mr. Howard. The car pulled into the restaurant parking lot and obtained a space directly south of another undercover detective who indicated that it was occupied by "a black female with long dark hair and glasses." The occupant of the vehicle matched the description of the person that the informant said had been part of previous drug transactions with Mr. Howard. The female was observed sitting inside the Volkswagen making calls on her cell phone and "30 seconds" later, the informant received an incoming call from the individual believed to be Mr. Howard. During this call, Mr. Howard asked the informant where he was, to which the informant replied that he was inside the restaurant. Mr. Howard then stated "well, you're inside and she's outside."

{¶4} At this time, both uniformed and undercover officers approached the Volkswagen, and the female, later identified as Harriet Caynon, attempted to back out of her parking space. Based upon the positioning of the police cruisers, Ms. Caynon was prevented from leaving the parking space. Police patted her down for weapons and placed her in handcuffs. Simultaneously, other officers searched the car and recovered 200 grams of heroin from Ms. Caynon's purse. During the pat down of Ms. Caynon, the police found a .25 caliber pistol in her front sweatshirt pocket.

{¶5} Ms. Caynon was indicted for trafficking in heroin, in violation of R.C. 2925.03(A)(C)(6), a felony of the first degree, possession of heroin, in violation of R.C.

2925.11(A)(C)(6), a felony of the first degree, and carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), a felony of the fourth degree.

{¶6} Ms. Caynon pleaded not guilty to all counts and filed a motion to suppress. In her motion, Ms. Caynon argued that the Akron police department (1) obtained her statement while knowing that she was impaired, (2) seized and searched her vehicle and person without a warrant or consent, and (3) conducted an overly intrusive search by frisking her and searching the interior of the vehicle.

{¶7} After an evidentiary hearing on the matter, the trial court denied Ms. Caynon's motion. Immediately afterward, she agreed to plead no contest to the indictment, and the trial court accepted her plea and found her guilty. Ms. Caynon was sentenced to a mandatory term of three years imprisonment for trafficking in heroin, to run concurrently with a mandatory term of three years imprisonment for possession of heroin and one year imprisonment for carrying a concealed weapon.

{¶8} Ms. Caynon appealed, raising one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT OVERRULED MS. CAYNON'S MOTION TO SUPPRESS THE STOP, SEIZURE, AND DETENTION OF HER PERSON IN VIOLATION OF HER FOURTH AND FOURTEENTH AMENDMENT PROTECTIONS IN VIOLATION OF THE UNITED STATES CONSTITUTION AND THE APPLICABLE OHIO CONSTITUTIONAL PROVISIONS.

{¶9} In her sole assignment of error, Ms. Caynon argues that the trial court erred in overruling her motion to suppress. We disagree.

{¶10} In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8, the Supreme Court of Ohio held that:

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.)

{¶ 7} It is well settled that an investigative traffic stop does not violate the Fourth Amendment of the U.S. Constitution where an officer has reasonable suspicion that the individual is engaged in criminal activity. *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999). In order to make a lawful stop of a vehicle, "the officer must have a reasonable suspicion, based upon specific and articulable facts, that an occupant is or has been engaged in criminal activity." *State v. Johnson,* 9th Dist. No. 03CA127-M, 2004-Ohio-3409, ¶ 6, citing *State v. Gedeon*, 81 Ohio App.3d 617, 618 (11th Dist.1992). Evaluating these facts and inferences requires the court to consider the *totality of the surrounding circumstances. See State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus, certiorari denied, 454 U.S. 822 (1981).

{¶11} This Court has also recognized that "[r]easonable suspicion is something less than probable cause." *State v. Epling*, 105 Ohio App.3d 663, 664 (9th Dist.1995), citing *State v. VanScoder*, 92 Ohio App.3d 853, 855 (9th Dist.1994). When "analyzing whether reasonable suspicion existed, [we] look [] to the facts available to the officer at the moment of the seizure or the search and consider [] whether those facts would warrant a man of reasonable caution in the belief that the action taken was appropriate." (Internal citations and quotations omitted.) *State v. Blair,* 9th Dist. No. 24208, 2008-Ohio-6257, ¶ 5.

{¶12} Further, pursuant to the Supreme Court of the United States' holding in *Terry v. Ohio,* 392 U.S. 1, (1968) "an officer is justified in conducting a limited pat down search of an

individual's outer clothing for weapons during an investigatory stop, if the officer has a 'reasonable suspicion, [based on the totality of the circumstances], that the individual whose behavior he is investigating at close range may be armed and dangerous.'" *State v. Robinson*, 9th Dist. No. 10CA0022, 2012-Ohio-2428, ¶ 16, quoting *State v. Andrews,* 57 Ohio St.3d 86, 89 (1991), citing *Terry* at 27.

{¶13} Finally, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (Internal quotation omitted.) *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). "If, while conducting a legitimate *Terry* search of an automobile's interior, the officer should [] discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." *Id*. at 1050.

{¶14} Here, Detectives Shawn Brown, Ted Male, Joseph Danzy, and Michael Gilbride testified on behalf of the State at the suppression hearing.

{¶15} Detective Brown stated that he had the "main surveillance" role in the investigation and that he could see the entire restaurant parking lot from where he had parked his vehicle. Detective Brown testified as follows:

Q. Was there anything obstructing your view from your vehicle to Ms. Caynon's?

A. No, ma'am.

Q. And how closely did the description match the vehicle that actually appeared?

A. It was spot on.

Q. Perfect; yes?

A. Yes.

Q. And so you said she pulled in about 20 feet from you?

A. She was parked in the spot directly in front of my vehicle.

* * *

Q. And tell us what you observed.

A. Detective Gilbride notified us over the radio that his source was making contact with one of the suspects.

I can then see the suspect at that point in time in the vehicle on the cellphone.

I didn't know the conversation on the cellphone, I could not hear [the] conversation on the cellphone, but I could see the cellphone up to the ear.

I could see her looking around over her shoulder, looking back—she actually looked at me twice, never made eye contact with me; I didn't alert her at all.

Two vehicles actually pulled into the parking lot and she watched both of those vehicles * * * followed them with her eyes until they parked.

When those patrons exited their vehicle and went into the restaurant, that's when she began to look around more; so, I know she was waiting for somebody.

Q. For how long does this go on?

A. I sat and watched her from anywhere between 8 to maybe 12 minutes.

Q. Is she doing these things you described during that 8 to 12 minutes?

A. Correct.

Q. What happens then?

A. When Detective Gilbride gave the—his signal for the units to move in, I actually pulled my vehicle forward so that she could not back her vehicle out and then attempt to flee.

As I pulled my vehicle forward, I exited and walked to the driver's side.

That's when two uniform officers, Detectives Male and Danzy, also approached from the front of the vehicle going to the driver's side.

Detective Brown further testified that the officers announced to Ms. Caynon that they were from the Akron Police Department, removed her from the vehicle, and placed her in custody. At that time, Detective Brown checked Ms. Caynon's purse for weapons and found heroin inside. In addition, Detective Brown testified that he was privy to the telephone conversations between the informant and Mr. Howard regarding the details of the drug transaction, and that it had been discussed that a female would be bringing the drugs.

{¶16} Detective Male testified that he and several other detectives approached Ms. Caynon's vehicle on foot after she attempted to back out of the parking space and leave the restaurant parking lot. The officers asked her to step out of the vehicle in order to make sure that she did not possess any weapons. At that time, Detective Male patted Ms. Caynon down and recovered a .25 caliber pistol from her front sweatshirt pocket.

{¶17} Detective Gilbride stated that he worked with the informant for approximately two weeks in order to arrange the drug transaction, and that all of the telephone calls between the informant and Mr. Howard were on speakerphone. Detective Gilbride testified as follows:

* * *

Q. What kind of drug is being discussed?

A. Heroin.

* * *

Q. Who was he calling?

A. His uncle, Gerald Howard.

* * *

Q. And does this person on the other end who your source has identified as Gerald Howard indicate that, in fact, he has some heroin that can be supplied?

A. Yes.

We arrested his nephew previous[ly]; he agreed to cooperate with us for consideration in his sentencing.

We asked who his drug supplier was. He said it was [his] uncle, Gerald Howard, he lives in Cleveland, Ohio. [He] bought drugs from him on numerous occasions, and agreed to set up the drug deal, which obviously led us to that date in question, told us there was a strong likelihood that the drugs would be delivered in a tan Volkswagen CC luxury sedan.

* * *

Q. Was there discussion on these calls with the source and who he identified as Mr. Howard as to who would be bringing the drugs in the tan vehicle?

A. No.

Initially we had reason to believe that it was going to be Gerald Howard.

However, he indicated that he had to pay real estate taxes up in Cleveland.

The individual we believed to be Gerald Howard stated that he would call back, to which he did.

The drug deal was arranged.

Information source had indicated that on one or two prior occasions that he had purchased heroin from his uncle, he was provided drugs from a black female with long black hair and glasses, but was unable to identify her beyond that.

* * *

{¶18} In denying Ms. Caynon's motion to suppress, the trial court stated:

Upon review of the evidence that has been presented here this morning, the Court finds that the police officers were working with a confidential informant that had been determined to be reliable.

The detective was privy to conversations regarding the place and time and the vehicle, including license plate number and identification that would be used in a drug transaction.

The vehicle that arrived matched the description of the vehicle that they were expecting and the description of the person that was driving the vehicle matched a * * * person that was previously known to assist Mr. Howard, who they were apparently expecting.

The driver of that vehicle's behavior, in that she was waiting and on the phone approximately ten minutes, waiting for someone, and then the simultaneous or the

nearly simultaneous phone calls that were made, and then received from Gerald Howard—yes, from Gerald Howard to the confidential informant, all within the hearing of the police officer, saying that she was there, she was waiting for them, and that she was outside waiting in the parking lot, it is the Court's determination that the police did have a reasonable, articulable suspicion that there was criminal activity being conducted by [Ms. Caynon] and that she may have a large amount of drugs in her possession and therefore were justified and not operating against [Ms. Caynon's] constitutional rights when they approached the vehicle, asked her to step out, and then conducted a search of the vehicle.

\* \* \*

{¶19} In the present matter, a series of events led up to the stop, search and detention of Ms. Caynon. First, the detectives had been working with a reliable informant for two weeks in order to arrange a drug transaction for 200 grams of heroin to be delivered by Mr. Howard. Second, the informant accurately told police that the drugs would likely be delivered in a tan Volkswagen luxury sedan registered to Mr. Howard. Third, during a series of telephone conversations, it was revealed that Mr. Howard would not personally deliver the drugs because he had to be in Cleveland in order to pay his real estate taxes. Fourth, the informant indicated that, on one or two previous occasions, a black female with long black hair and glasses provided him with drugs. Fifth, at the time of the scheduled drug transaction, the police observed Ms. Caynon, a black female with long black hair and glasses, pull into the restaurant parking lot driving a tan Volkswagen luxury sedan registered to Mr. Howard. Sixth, while Ms. Caynon waited in the parking lot, Mr. Howard spoke with the informant on the telephone and asked where he was, to which the informant replied that he was inside the restaurant. Mr. Howard then stated "well, you're inside and she's outside." Seventh, upon asking Ms. Caynon to step out of the vehicle, police recovered, among other things, 200 grams of heroin from her purse and a .25 caliber pistol from the inside of her sweatshirt pocket.

{¶20} Based upon the totality of the circumstances, as summarized above, we conclude that the Akron police had reasonable, articulable suspicion to initiate the investigative stop because they believed that Ms. Caynon was engaging in, or about to engage in, criminal activity. Additionally, Detective Male testified that firearms are commonly involved in drug transactions, and, in the last twelve years, over 1,000 guns were recovered during drug investigations. Detective Brown also testified that, in his experience, women are likely to carry weapons in their purses, and Ms. Caynon's purse was open, on the driver's side floor of the vehicle. As such, because Ms. Caynon could have been armed and dangerous, we also conclude that the detectives had reasonable, articulable suspicion in patting her down and searching her purse for weapons. Therefore, the police did not violate Ms. Caynon's constitutional rights by invoking the stop, searching the vehicle for weapons, patting Ms. Caynon down for weapons, and placing Ms. Caynon under arrest for the offenses listed in the indictment.

{¶21} Ms. Caynon's sole assignment of error is overruled.

### III.

{¶22} In overruling Ms. Caynon's sole assignment of error, the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, J.
CONCURS.

BELFANCE, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

PATRICIA J. SMITH, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.